```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
                      ATHENS DIVISION

WILLIAM DAVID HALLMAN,            *

      Plaintiff,                  *

vs.                               *

LIBERTY LIFE ASSURANCE COMPANY    *      CASE NO. 3:15-CV-49 (CDL)
OF BOSTON and NOVELIS
CORPORATION,                      *

      Defendants.                 *
_____
```

## O R D E R

Plaintiff William David Hallman was insured under a long term disability insurance policy that Defendant Liberty Life Assurance Company of Boston ("Liberty") issued to his former employer, Novelis Corporation, for the benefit of its employees. Hallman asserts that he became disabled in October 2010. Liberty initially concluded that Hallman was entitled to long term disability benefits but later terminated the benefits. Hallman contends that Liberty improperly terminated his long term disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Liberty maintains that its decision to terminate Hallman's benefits was correct, and it seeks judgment on the administrative record. Hallman argues that the undisputed facts

establish that Liberty's termination of his benefits was wrong, and he seeks summary judgment on this issue.

Where, as here, both sides rely on an agreed-upon administrative record, judicial economy favors deciding the case using findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, not summary judgment under Federal Rule of Civil Procedure 56. *See Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008).  Although the facts from the administrative record are essentially undisputed, the Court nevertheless finds it appropriate to decide the case with factual findings.  In making its findings of fact, the Court "is limited to 'the facts as known to the administrator at the time the decision was made.'" *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).  Based on the following findings of fact and conclusions of law, the Court grants Liberty's motion (ECF No. 22) and denies Hallman's motion (ECF No. 23).

FINDINGS OF FACT

In support of its motion, Liberty filed a statement of facts with citations to the administrative record.  Hallman objected to a handful of the fact statements as irrelevant and misleading but did not otherwise object.  Hallman also filed a statement of facts, and he cited a few portions of the

administrative record in his summary judgment brief.  The Court
reviewed the fact statements and the citations to the record,
and the Court's findings of fact are based on the portions of
the administrative record which the parties cited.[1]

Hallman does argue that it would be "premature" for the
Court to consider Liberty's motion for judgment on the
administrative record "since the Court has not had the
opportunity to review all the facts that are in issue."  Pl.'s
Resp. to Defs.' Mot. for J. on the Admin. R. 4-5, ECF No. 30-2.
But, as discussed above, the Court must review the facts as
known to Liberty when it decided to terminate Hallman's long
term disability benefits.  Those facts are in the administrative
record, which is before the Court.  Hallman had ample
opportunity to point to those portions of the administrative
record that support his claims.

---

[1] In his response to Liberty's motion, Hallman attempts to incorporate
by reference his seventy-four page appeal to Liberty following the
September 2013 termination of benefits.  The appeal consists of
counsel's twenty-seven page (single spaced) appeal letter to Liberty
and an article about chronic back pain.  Under the Court's local
rules, a response brief may not exceed twenty pages.  M.D. Ga. R. 7.4.
Hallman did not seek or receive an extension of the page limitations,
and he did not offer any reason why he could not adequately explain
his legal theories in his summary judgment briefs and his response to
Liberty's motion for judgment on the administrative record.  For these
reasons, the Court declines to review counsel's appeal letter to
determine whether it raises arguments in addition to those Hallman
presented in his briefs.

## I.    The Policy

Liberty   issued   Group   Policy   No.   GF3-880-024947-01 ("Policy") to Hallman's former employer, Novelis.   Defs.' Mot. for J. on the Admin. R. Ex. 2, Admin. R. XV at CL 1057, ECF No. 22-16.   The Policy provided long term disability coverage under an employee welfare benefit plan sponsored and maintained by Novelis under ERISA.   Under the Policy, Liberty "agree[d] to pay benefits provided by" the Policy "in accordance with its provisions."   *Id.*   The Policy states that Liberty will pay benefits once certain requirements are met.   *Id.* at CL 1077. The Policy further states that Liberty "shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."   *Id.* at CL 1095.

The Policy states that "Disability" or "Disabled" means:

i.   that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii.   thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

*Id.* at CL 1064.   The term "'Own Occupation' means the Covered Person's occupation that he was performing when his Disability

4

. . . began." *Id.* at CL 1068.  The term "'Any Occupation' means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." *Id.* at CL 1063.

The Policy further states:

> When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:
>
> 1. Disability;
>
> 2. Regular Attendance of a Physician; and
>
> 3. Appropriate Available Treatment.
>
> The Proof must be given upon Liberty's request and at the Covered Person's expense.

*Id.* at CL 1077.  The term "'Proof' means the evidence in support of a claim for benefits." *Id.* at CL 1070.

## II.  Hallman's Occupation and Short Term Disability Claim

Hallman began working for Novelis in 1983.  His job title was "DC Operations Technician."  In that position, he operated a crane.  *E.g.*, Admin. R. I at CL 0048, ECF No. 22-2.  The job required Hallman to work 12-hour rotating schedules around molten metal.  Admin. R. XV at CL 1032.  It also required him to climb on and off a fork truck several times a day, climb stairs, and lift up to fifty pounds.  *Id.*  And it required him to work

in cold temperatures during winter and in hot temperatures during summer. *Id.*

Hallman claimed to be disabled from his occupation on October 9, 2010 due to back pain caused by lumbar degenerative disc disease, as well as other physical ailments. Admin. R. I at CL 0031. He submitted a claim for short term disability benefits, which were self-funded by Novelis. Novelis paid short term disability benefits for the maximum short term disability period, from October 9, 2010 through April 30, 2011. Admin. R. XII at CL 0877, ECF No. 22-13.

## III. Initial Approval of Hallman's Long Term Disability Claim

While Hallman was receiving short term disability benefits, Liberty informed Hallman that it would consider his claim for long term disability benefits under the Policy. *Id.* Under the Policy, Hallman had to be "unable to perform the Material and Substantial Duties of his Own Occupation" for the first two years of disability. Admin. R. XV at CL 1064. According to Hallman's family physician, Dr. Ralph Compton, as of October 2010, Hallman suffered from worsening back pain with occasional tingling and pain in his right leg. *Id.* at CL 1038. Hallman was also morbidly obese. *Id.* In November 2010, Dr. Compton advised Hallman's wife that Hallman needed to lose weight and get involved in a physical therapy program. *Id.* at CL 0990.

6

Dr. Compton also referred Hallman to a pain clinic for physical therapy and to Dr. Phillip Tibbs, a neurosurgeon.  *Id.*

Hallman saw Dr. Tina Fawns, another family practitioner, in November 2010.  Dr. Fawns noted that Hallman was morbidly obese, that he reported chest pain, that his wife reported that he had sleep apnea, and that he had a bulging disc with bilateral foraminal stenosis.  *Id.* at CL 1004.  She also noted that two neurosurgeons recommended a spinal fusion for Hallman but wanted him to lose 100 pounds before they would perform the surgery. *Id.* at CL 1001.  Dr. Fawns conducted testing that showed obstructive sleep apnea and a mild bulging disc at L-4 and diabetic neuropathy.  *Id.* at CL 1019.  Dr. Fawns recommended a CPAP machine for the sleep apnea, as well as a weight loss program, spinal injections, and physical therapy.  *Id.*  Hallman, however, did not want treatment for sleep apnea, and Dr. Fawns believed that he would not comply with her recommendations for weight loss and physical therapy.  *Id.*  Dr. Fawns concluded that Hallman just wanted "pain meds without making effort."  *Id.*  Dr. Fawns continued to treat Hallman, and she completed a restrictions form for Hallman on April 7, 2011.  Admin R. VIII at CL 0850, ECF No. 22-9.  She stated that Hallman could not walk, sit, or stand "for prolonged periods of time," that he could lift and carry ten pounds, and that "prolonged sitting would make [his] back pain worse."  *Id.*

Dr. Tibbs, the neurosurgeon, also completed a restrictions form for Hallman in April 2011. Dr. Tibbs noted that Hallman had chronic lower back pain. *Id.* at CL 0842. He also noted that Hallman was capable of full-time sedentary work, which means "lifting/carrying up to 10 pounds occasionally, sitting over 50% of the time and standing/walking occasionally." *Id.*

As authorized under the Policy, Liberty requested an opinion from Dr. Philippe Chemaly, a physician specializing in pain management and rehabilitation. Dr. Chemaly reviewed records provided by Dr. Compton, Dr. Tibbs, and Dr. Fawns, as well as Hallman's lab results and other documents. Admin. R. XV at CL 1101. Dr. Chemaly concluded that the diagnosis causing Hallman "significant impairment" was "the diagnosis of lumbar degenerative disc disease and lumbar facet mediated pain." *Id.* at CL 1105. Dr. Chemaly noted that this impairment "would result in the following restrictions and limitations": sitting for up to seven hours with rest breaks; limited standing; and lifting limited to ten pounds." *Id.* at CL 1105-06. Dr. Chemaly also noted: "No working at elevated heights or operating of heavy machinery. These restrictions and limitations should be considered permanent for an eight hour work position." *Id.*

Based on the information provided by Hallman's doctors and Dr. Chemaly, Liberty concluded that Hallman was disabled from his own occupation beginning October 9, 2010. Admin. R. VIII at

CL 0822-23.   On May 17, 2011, Liberty informed Hallman that he was eligible to receive long term disability benefits under the Policy as of May 1, 2011.   *Id.* at CL 0823.   Liberty also informed Hallman that his claim would be "evaluated periodically to determine ongoing disability."   *Id.* at CL 0822.

## IV.   Termination (and Reinstatement) of Hallman's Benefits: "Own Occupation"

In April 2011, Hallman consulted two interventional pain medicine physicians, Dr. Aarti Singla and Dr. Michael Harned. His physical exam revealed 5/5 motor strength in upper and lower extremities (normal); intact sensory examination; ability to do a straight leg raise without pain; and ability to flex and touch his mid thigh, though "[f]acet loading on the right side reproduced increased pain and somewhat on the left side." Admin. R. VII at CL 0717, ECF No. 22-8.   In May 2011, Hallman underwent medial branch nerve blocks in his lower back.   *Id.* at CL 0714-15.   In August 2011, Hallman underwent radiofrequency thermocoagulation of his lower back. Admin. R. V at CL 0537-38, ECF No. 22-6.   At his follow-up visit in September 2011, Hallman's physical exam showed 5/5 muscle strength (normal) with some right knee pain.   *Id.* at CL 0532-33.

In August 2012, Hallman completed an activities questionnaire.   He reported that he sat for three to five hours per day, stood for two hours a day, and walked forty-five to

sixty minutes each day.  Admin. R. VII at CL 0640-42.  Hallman also reported that the length of time he was able to drive varied.  *Id.*  He further reported that he left the house two or three times per day, ran errands three times per week, and was trying to take care of his mother.  *Id.*  Hallman also stated that he spent three or more hours on his home computer every day, and that he used the computer to pay bills, read articles, use search engines, send emails, visit chat rooms, and for photos.  *Id.* at 0641.  He also stated that he used word processing software, spreadsheet software, and database software.  *Id.*

In October 2012, Liberty received notice that the Social Security Administration determined that Hallman was disabled under its rules and was entitled to a monthly SSDI benefit of $1,924.80 beginning in April 2011, with a cost of living adjustment to $1,994.00 in December 2011.  Admin. R. VI at CL 0591-92, ECF No. 22-7.  The Social Security Administration's medical consultant, Dr. Mary McLarnon, completed a Physical Residual Functional Capacity Assessment for Hallman in September 2012.  She concluded that Hallman could stand/walk for 1.5 hours per day, sit for four hours per day, and must alternate sitting and standing throughout the day.  Admin. R. IV at CL 0408, ECF No. 22-5.

Liberty asked Dr. Jamie Lewis, who is board certified in physical medicine and rehabilitation pain medicine, to review Hallman's medical records and restriction forms.   Dr. Lewis produced a report dated November 13, 2012.   Based on his review of the documentation regarding Hallman, Dr. Lewis concluded that the documentation did "not describe loss of joint stability, ROM (range of motion), dexterity, or strength to support ongoing functional limitations."   Admin. R. V at CL 0498.   Although Dr. Lewis noted Hallman's "lack of therapeutic response to his pain with multiple medications," he concluded that Hallman could "work for a total of eight hours per day and 40 hours per week with no restrictions and limitations."   *Id*.   He also concluded that the side effects from Hallman's medication would not significantly impair Hallman's function.   *Id.*   Although Dr. Lewis noted that he tried to reach Hallman's neurosurgeon, Dr. Tibbs, Dr. Lewis did not actually speak with him.   *Id.* at CL 0497.

On November 20, 2012, Liberty informed Hallman that it had completed a review of his eligibility for disability benefits and "determined that benefits are not payable beyond November 13, 2012."   *Id.* at CL 0502.   Liberty explained that because it determined that Hallman could "work for a total of eight hours per day and 40 hours per week with no restrictions or limitations," he was no longer disabled from his own occupation

11

and thus was no longer disabled within the meaning of the Policy. *Id.* at CL 0504. Hallman appealed.

In reviewing Hallman's appeal, Liberty employees noted that Hallman's records documented low back pain with no significant relief from conservative treatment. Admin. R. I at CL 0015. Liberty also received records from Dr. Julian Price, an orthopedic surgeon. Hallman visited Dr. Price in June 2013, and Dr. Price told Hallman that his options included conservative care, injections, and surgery. Admin. R. II at CL 0308, ECF No. 22-3. Hallman told Dr. Price he would like to have the surgery—a fusion of his L5-S1 vertebrae. *Id.* Liberty's nurse case manager, Martha Jones, reviewed Hallman's file and determined that Hallman's restrictions included "no lifting, carrying, pushing or pulling over 5 lbs, less than occasional standing and walking, no bending, twisting, squatting or stooping; ability to sit w[ith] change of position as needed." Admin. R. I at CL 0016. And Liberty's disability case manager, Richard Tom, noted that Hallman had been awarded SSDI benefits and acknowledged that Hallman may only have sedentary work capacity. *Id.* at CL 0015. Tom recommended that Hallman's benefits should be resumed as of November 13, 2012. By letter dated July 9, 2013, Tom notified Hallman that he qualified "for continuation of benefits." Admin. R. IV at CL 0371. Hallman's benefits were

reinstated, and he received a retroactive benefit payment.  *Id.*
at CL 0370; Admin. R. II at CL 0343.

**V.   Termination of Hallman's Benefits: "Any Occupation"**

When Tom notified Hallman in July 2013 that he qualified
for continuation of benefits, he explained that for the first
twenty-four months, Hallman's disability was "evaluated based on
[Hallman]'s inability to perform the material and substantial
duties of his occupation."  Admin. R. IV at CL 0371.  After
that, Hallman's "disability will be evaluated based upon the
employee's inability to perform the material and substantial
duties of his own or any occupation for which he has or becomes
reasonably fitted by training, education or experience."  *Id.*
Tom also notified Hallman that his claim would be "evaluated
periodically."  *Id.*

In August 2013, Hallman's wife sent more of Hallman's
medical records to Liberty, including the medical records from
Dr. Mark Ellis, a pain management doctor.  Dr. Ellis completed a
restrictions form for Hallman dated August 20, 2013, stating
that Hallman was "totally disabled" and could not perform even
sedentary work.  Admin. R. II at CL 0290.  Dr. Ellis further
stated that Hallman was "unable to sit/stand for [a] prolonged
period of time," that his walking was "limited to short
distances only," that Hallman could not "bend, stoop, [or]
twist[]," and that Hallman could not "carry/lift > 5-10 lbs."

13

*Id.* Dr. Ellis also noted that Hallman was being evaluated for possible surgery. *Id.*

In late August 2013, Tom contacted Dr. Price's office to ask whether Hallman had scheduled the fusion surgery. Admin. R. I at CL 0010. Hallman had not scheduled the surgery or contacted the office. Tom then followed up with Hallman's wife, who explained that Dr. Price had recommended that Hallman lose some weight before the surgery. *Id.* Tom noted that Dr. Price's records did not indicate any weight loss goals or state that the surgery would be postponed pending Hallman's weight loss efforts. *Id.*

On September 19, 2013, Tom received a report by Dr. Wayne Beveridge, a neurosurgeon. Hallman visited Dr. Beveridge on August 8, 2013 for a second opinion regarding surgical intervention. *Id.* at CL 0261. Dr. Beveridge told Hallman that he thought it would be "foolish for him to consider" fusion surgery. *Id.* Instead, Dr. Beveridge recommended that Hallman try to lose more than 100 pounds; Dr. Beveridge believed that weight loss surgery and conditioning would offer "much higher success in terms of getting [Hallman] to feel better" than the fusion surgery. *Id.*

Tom sent Hallman's medical records, including records from Dr. Beveridge, to Dr. Jason Sherman, a physician who is board certified in pain management and rehabilitation. Dr. Sherman

prepared a report dated September 23, 2013. Dr. Sherman noted that Hallman had "a number of supported diagnoses including right knee pain, low back pain, mild L4-L5 degenerative disc disease, a mild L4-L5 annular bulge, with mild foraminal narrowing, grade 1 anterolisthesis of L5 on S1 due to a bilateral pars defect." *Id.* at CL 0239 He also noted that Hallman had "diabetic peripheral neuropathy per his EMG and nerve conduction studies, as well as a subjective lumbar radiculopathy." *Id.* Dr. Sherman concluded that the "objective findings in the medical documentation provided [did] not support any specific impairments related to [Hallman]'s conditions." *Id.* And Dr. Sherman opined that Hallman had "sustainable capacity to work full-time without restrictions." *Id.* at CL 0240. Dr. Sherman further opined that Hallman's morbid obesity did not cause "any impairments, restrictions or limitations on his ability to work." *Id.* Finally, Dr. Sherman noted that Hallman made "numerous requests for specific pain medications" and "did not follow through with a number of recommendations provided by the physicians that he had seen." *Id.* at CL 0238. In preparing his report, Dr. Sherman tried to reach Dr. Ellis but did not actually speak with him. *Id.* at CL 0239.

By letter dated September 26, 2013, Liberty informed Hallman that it had concluded, based on a review and assessment by an independent physician, that Hallman's occupational

restrictions were "no longer supported" and that Hallman thus was not disabled under the Policy. *Id.* at CL 0243. The letter acknowledged that Hallman's medical records confirmed diagnoses of "right knee pain, low back pain, mild L4-5 degenerative disc disease, a mild L4-5 annual bulge with mild foraminal narrowing, and grade 1 anterolisthesis of L5-S1 due to a bilateral pars defect." *Id.* The letter also noted that Hallman had been diagnosed with diabetic peripheral neuropathy and morbid obesity. *Id.* Hallman appealed.

On April 9, 2014, Hallman's attorney provided Liberty with additional records from Dr. Ellis—records dated September 2013 through January 2014. According to Hallman's history and physical report, Dr. Ellis found that Hallman still suffered from chronic low back pain in January 2014 and that there had been no change in his pain since his previous visit in October 2013. *Id.* at CL 0116. Dr. Ellis noted that Hallman had deferred "any further pursuit of bariatric surgery" and that he encouraged Hallman to try "some type of physical activity, calorie counting to pursue weight loss." *Id.* Dr. Ellis also completed an Attending Physician Statement in Support of Disability. *Id.* at CL 0114-15. The statement, which is dated March 31, 2014, lists diagnoses of lumbar degenerative disease and obesity, states that Hallman's current symptom is chronic lower back pain, and states that Hallman "is unable to sit for

prolonged periods of time," has "difficulty . . . stand[ing] from seated position," and is "unable to walk or stand for prolonged periods of time." *Id.* at CL 0114. The form, which noted that Hallman had been a machine operator before he became unable to work, asked Dr. Ellis to opine whether Hallman was "able to perform the duties of any occupation for which he is reasonably fitted based on education, training, experience, age, and mental and physical capacity with reasonable continuity (full-time)." *Id.* at CL 0115. Dr. Ellis checked "No." *Id.* The form did not specifically ask whether Hallman could perform a sedentary occupation.

In connection with Hallman's appeal, Liberty had Dr. Mark Kaplan, a physician who is board certified in pain medicine and rehabilitation, review Hallman's medical records, the records Liberty received in connection with Hallman's SSDI award, and a number of other documents. Dr. Kaplan also spoke with Dr. Ellis, who told Dr. Kaplan that Hallman's "biggest problem is transitioning from sitting to standing," that a "sedentary capacity at most was endorsed," and that Dr. Ellis had addressed bariatric surgery but Hallman had declined. *Id.* at CL 0098; *accord id.* at CL 0078-79 (Dr. Ellis acknowledging that Dr. Kaplan's notes accurately reflect their conversation).

Dr. Kaplan noted that as of September 2013, Hallman had an impairment of his lumbar spine that limited activities requiring

17

standing and walking.  *Id.* at CL 0098.  Dr. Kaplan further noted that Hallman had "obstructive sleep apnea, hypertension, diabetes, dyslipidemia, osteoarthritis of the knees, and is morbidly obese."  *Id.* at CL 0099.  Dr. Kaplan determined that Hallman's reported pain level was "consistent with the medical evidence provided for review."  *Id.*  Dr. Kaplan further determined that the following restrictions were reasonable for Hallman from September 2013 forward:

- Restrict lifting and carrying up to 20 pounds occasionally

- Restrict pushing and pulling up to 20 pounds occasionally

- Restrict in total balancing and climbing ladders

- Restrict in total squatting, kneeling, crouching, and pedaling

- Restrict standing and walking to a cumulative total of 1 hour in an eight hour day, 15 minutes continuously

- Allow position changes as needed when sitting, standing, or walking

*Id.* at CL 0099-100.

Based on his review of Hallman's medical records and his discussion with Dr. Ellis, Dr. Kaplan opined:

> In terms of a full time capacity, although the claimant is obese, the medical evidence does not support impairment from this, and he had previously worked without restrictions. There is no identified cardiopulmonary limitation or other impairing physical condition that would be expected to impact endurance or the ability for sustained physical activities.

18

> Therefore, the available information supports the
> ability to sustain a full time capacity within the
> restrictions and limitations identified as of 9/25/13
> and forward.

*Id.*

After Dr. Kaplan completed his report, Liberty's senior vocational case manager, Jason Miller, conducted a Transferable Skills Analysis/Vocational Review, and he prepared a report of his findings. Miller reviewed Hallman's claim file and conducted research using a number of vocational research resources. *Id.* at CL 0073. Miller noted that Hallman graduated from high school and had both home and work computer experience.[2] Miller found that Hallman had the following non-physical transferable skills from his job at Novelis:

- Follow written and verbal instructions

- Utilize basic computer applications

- Record information accurately

- Complete and keep up production documentation

- Complete shipping documentation

- Material record database documentation

- Ensure product traceability

---

[2] Hallman argues that he had minimal computer experience, but he pointed to no evidence to support this assertion. On the other hand, Liberty pointed to a portion of the administrative record suggesting that Hallman used his home computer extensively and had experience with several Microsoft programs. *See, e.g.,* Admin. R. VII at CL 0640-41.

Admin. R. I at CL 0074.  Miller determined that based on Hallman's education, training, and experience, Hallman could perform several sedentary occupations consistent with the restrictions and limitations outlined by Dr. Kaplan.  *Id.* at CL 0075.  To reach this conclusion, Miller "researched standard vocational resources (e.g. Dictionary of Occupational Titles (DOT), Occupational Outlook Handbook (OOH), Occupational Information Network (O*NET) / Standard Occupational Classification (SOC) coding system, Guide for Occupational Exploration (GOE), etc.) and Internet job boards."  *Id.* at CL 0073.  Based on that research, Miller found several occupations that "require an equal or lower level of skill than Mr. Hallman's prior work experience, education and/or skills acquired from other pursuits."  *Id.* at CL 0075.  Those occupations include: Production Clerk – Manufacturing & Processing; Expediter – Parts, Products & Materials; and Order Clerk – Industrial & Other.  *Id.*

Based on the reports by Dr. Kaplan and Miller, Liberty upheld its decision that Hallman was not disabled from any occupation beyond September 24, 2013.  *Id.* at CL 0066-72.  In its letter dated June 30, 2014, Liberty acknowledged that Hallman continued to have back pain but stated that the medical evidence supported its determination that Hallman could perform full-time sedentary work.  *Id.* at CL 0071.  Liberty stated that

it considered the Social Security Administration's decision to approve SSDI benefits but noted that it had access to updated medical records and medical reviews that were not available when the Social Security Administration made its decision in October 2012. *Id.* at CL 0072. Finally, Liberty informed Hallman of his right to file a civil action under ERISA. *Id.*

## VI.  Hallman's Requests for Records

In January 2013, Hallman sent Liberty a request for records relating to his claim. Admin. R. V at CL 0453. He asked for "a copy of the doctor notes from [Liberty's] independent Pain Management doctor," as well as another copy of Liberty's November 2012 benefits termination letter. *Id.* In response, Liberty sent Hallman "a copy of all medical documentation for [his] disability file." *Id.* at CL 0451.

On October 7, 2013, Liberty received Hallman's request for "ALL doctor notes from [Liberty's] Independent Doctor from September 2013." Admin. R. I at CL 0219. That day, Tom sent Hallman a thumb drive containing his complete disability file. *Id.* at CL 0005-6, CL 0218. Hallman could not open the thumb drive files, so he requested a paper copy. *Id.* at CL 0005. Liberty sent the paper copy to Hallman on October 16, 2013. *Id.* at CL 0213.

In November 2013, Hallman's attorney, Robert Kerr, requested the following documents from Liberty:

- A complete copy of Liberty Mutual's underwriting and claim files for Mr. Hallman's disability claim with Liberty Mutual;

- A complete copy of the above-referenced insurance policy(s);

- Any and all inter office memoranda, notes, reports, communications or documents relevant to your review of Mr. Hallman's disability claim;

- Any and all correspondence (including E-mail) between Liberty Mutual, and/or any third party relevant to your review of Mr. Hallman's disability claim;

- Any and all internal correspondence (including E-mail) between Liberty Mutual Representatives relevant to Mr. Hallman's disability claim;

- Any and all financial analysis, notes or reports relevant to Mr. Hallman's disability claim;

- C. V. of all doctors and other professionals who were involved in and/or evaluated Mr. Hallman's disability claim;

- All reports and all other forms of documentation generated by specialists, including but not limited to physicians, vocational experts, and medical professionals relevant to Mr. Hallman's disability claim;

- Medical reports and medical records summaries completed by or at the request of Liberty Mutual that are relevant to Mr. Hallman's disability claim;

- Claims directives, explanations, guides, memorandums, etc., that discuss the administration and evaluation of claims by Liberty Mutual;

- Claims Review Training documents used by Liberty Mutual;

- Claims Review Training videos and tapes used by Liberty Mutual;

- Guides pertaining to claims resolutions used by Liberty Mutual; and

- Any other documents, reports, communications or information relevant to Mr. Hallman's claim for disability benefits.

*Id.* at CL 0208-09.  On November 21, 2013, Liberty sent Kerr a copy of the Policy, as well as Hallman's complete claim file. *Id.* at CL 0204-05.

After Liberty denied Hallman's second appeal in 2014, Kerr asked Liberty to send him the same documents he had requested in November 2013, including a copy of Hallman's claim file, documents relevant to Hallman's claim, and the CVs of the doctors who evaluated Hallman's claim.  *Id.* at CL 0063-64. Liberty sent Kerr a copy of the Policy and Hallman's claim file. *Id.* at CL 0062.  Liberty represented that the claim file constituted "all information that was received and considered in [Liberty's] evaluation of Mr. Hallman's claim." *Id.*  Liberty also represented that the claim file contained "all reports generated by medical and/or vocational personnel," that the "names and titles of medical/vocational personnel are contained in the claim file, as well as the CVs of the reviewing physicians." *Id.; accord id.* at CL 0051-61 (CVs of Drs. Sherman, Lewis, and Kaplan).  According to Liberty, Dr. Chemaly's report was inadvertently misfiled and not placed in

Hallman's file, so it was not included in the documents Liberty sent to Kerr in July 2014.   Liberty later added Dr. Chemaly's report and CV to the administrative record.

Liberty declined to provide Kerr with its documentation regarding Liberty's administration and evaluation of claims and its training materials and guides.   *Id.* at CL 0062.   Liberty asserted that ERISA did not require disclosure of these items and that it had provided Kerr "with all information that was received and considered in [Liberty's] review of [Hallman's] claim."   *Id.*

CONCLUSIONS OF LAW

## I.   Hallman's Termination of Benefits Claim Against Novelis

Hallman asserts a termination of benefits claim against his former employer, Novelis.   Novelis contends that it cannot be held liable because the Policy states that *Liberty* agreed "to pay benefits provided by" the Policy "in accordance with its provisions."   Admin. R. XV at CL 1057.   The Policy also states that *Liberty* will pay benefits once certain requirements are met.   *Id.* at CL 1077.   The Policy further states that *Liberty* "shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.   Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."   *Id.* at CL 1095.   In sum, the

Policy delegated authority for claim determination to Liberty, and the Policy required Liberty to pay benefits on approved claims. Hallman did not respond to this argument and did not point to any evidence that Novelis exercised control over or otherwise played a role in Liberty's determination of his claim. Novelis is therefore entitled to judgment on the administrative record as to Hallman's termination of benefits claim against it.

## II. Hallman's Termination of Benefits Claim Against Liberty

Hallman's termination of benefits claim against Liberty is based on Liberty's determination that Hallman is not disabled from any occupation within the meaning of the Policy. Liberty made this determination in September 2013 and upheld it on appeal in June 2014.

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The Eleventh Circuit has "established a multi-step framework to guide courts in reviewing" ERISA benefits determinations. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam). The framework has six steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong*," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355. Hallman does not contend that Liberty was influenced by a conflict of interest, Pl.'s Resp. to Defs.' Mot. for J. on the Admin. R. 4, so the Court's review focuses on the first three steps. Hallman does not appear to dispute that Liberty was vested with discretion in reviewing claims. *See* Admin R. XV at CL 1095 (stating that Liberty "shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding"). Thus, the ultimate question for the Court is whether Hallman established that Liberty was arbitrary and capricious in

26

terminating Hallman's benefits.  "As long as a reasonable basis appears for [Liberty's] decision . . ., it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008) (quoting *Jett*, 890 F.2d at 1140).

Hallman contends that Liberty made two errors in denying his benefits claim.  First, he argues that Liberty had no reasonable basis for concluding that Hallman had the capacity to work a full-time sedentary job.  Second, he contends that Liberty's vocational expert only identified hypothetical alternative positions for Hallman, not actual positions.  The Court addresses each issue in turn.

Hallman argues that he has two conditions—chronic low back pain and morbid obesity—that render him unable to work in any occupation.  Liberty does not dispute that Hallman is morbidly obese or that he has chronic low back pain.  Liberty also does not dispute that Hallman has been diagnosed with several other conditions, including obstructive sleep apnea, hypertension, diabetes, and knee pain.  Liberty argues, however, that these conditions do not render Hallman unable to work in any occupation.

In making its latest benefits determination regarding Hallman, Liberty had the following information regarding Hallman's condition:

- Dr. Tibbs's April 2011 restrictions form for Hallman, which stated that Hallman was capable of full-time sedentary work.

- Hallman's August 2012 activities questionnaire, reporting that he sat for three to five hours per day, stood for two hours per day, walked forty-five to sixty minutes per day, ran errands several times a week, and spent three or more hours on his home computer every day.

- The Social Security Administration medical consultant's September 2012 conclusion that Hallman could stand/walk for 1.5 hours per day and sit for four hours per day.

- Dr. Price's records from June 2013 suggesting that conservative treatment options had not significantly alleviated Hallman's pain symptoms.

- Dr. Ellis's August 2013 restrictions form for Hallman, which stated that Hallman was totally disabled and could not perform sedentary work because he could not sit or stand for prolonged periods of time.

- Dr. Beveridge's records from September 2013 suggesting that fusion surgery was not a good option for Hallman and that weight loss and conditioning would be a better option to help Hallman improve.

- Dr. Ellis's January 2014 statement that Hallman's pain had not changed since October 2013.

- Dr. Ellis's March 2014 attending physician statement, which stated that Hallman could not sit for extended periods of time and had trouble standing from a seated position. In addition, Dr. Ellis answered "no" to the form's question of whether Hallman could perform the duties of any occupation for which he is reasonably fitted, although the form did not specifically ask whether Hallman could perform full-time sedentary work.

- Dr. Kaplan's report of his conversation with Dr. Ellis, who told Dr. Kaplan that Hallman's biggest problem was transitioning from sitting to standing, that a sedentary capacity at most was endorsed, and that Hallman had declined bariatric surgery.

- ◆ Hallman's medical records documenting a consistent diagnosis of mild degenerative disc disease and an impairment of his lumbar spine.

Based on this information, Liberty's independent medical reviewer, Dr. Kaplan, determined that Hallman should have several physical restrictions from September 2013 forward. But he also determined that the available information supported a conclusion that Hallman could work a full-time sedentary job within those restrictions.

Under the Policy, Hallman had the burden to provide proof that he was disabled within the meaning of the Policy. Liberty considered information provided by Hallman's doctors and relied on the advice of independent medical professionals, including Dr. Kaplan, to conclude that Hallman had not established that he was disabled from any occupation. Hallman emphasizes that Dr. Ellis stated that Hallman was totally disabled. But there was evidence in the administrative record that reasonably could have led Liberty to doubt that assessment—including Dr. Ellis's own clarification of his position to explain that Hallman's biggest problem was transitioning from sitting to standing and that a sedentary capacity at most was endorsed. In addition, another of Hallman's physicians, Dr. Tibbs, cleared him for sedentary work. And, even if Dr. Ellis had not clarified his position on Hallman's limitations, "the plan administrator may give different weight to [the treating physicians'] opinions without

29

acting arbitrarily and capriciously." *Blankenship*, 644 F.3d at 1356. "Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians." *Id.* Hallman did not point to anything in the record suggesting that Liberty acted unreasonably in relying on Dr. Kaplan's opinion regarding Hallman's limitations. Dr. Kaplan's opinion was similar to that of Dr. Tibbs, and after Dr. Kaplan asked Dr. Ellis to reflect further on Hallman's limitations, Dr. Ellis suggested that Hallman could be endorsed for a sedentary occupation. For these reasons, even if Liberty's conclusion regarding Hallman's limitations was not *de novo* correct, it was reasonable and was not arbitrary and capricious.

Hallman appears to argue that even if Liberty was reasonable in concluding that he could work a sedentary occupation with the restrictions outlined by Dr. Kaplan, Liberty was unreasonable in determining that there were sedentary occupations that Hallman could do. After Dr. Kaplan concluded, based on the available information, that Hallman could work a full-time sedentary job with several restrictions, Liberty's vocational case manager, Miller, used a variety of vocational resources to research sedentary occupations that could accommodate Hallman's restrictions and which required an equal or lower level of skill than Hallman's prior work experience, education, and skills acquired from other pursuits. Miller

found several occupations that could accommodate Hallman's restrictions and skill level. Contrary to Hallman's assertion, this is not a case where the vocational case manager asserted that Hallman could work "jobs that exist only hypothetically." *Kennard v. Means Indus., Inc.*, 555 F. App'x 555, 558 (6th Cir. 2014). In *Kennard*, the plaintiff had significant lung damage and could only work an "absolute clean-air" job. *Id.* at 557. The plan administrator in *Kennard* did not present evidence that such a job existed. *Id.* at 558. In contrast, here, Liberty's vocational case manager used several resources to find actual occupations that could accommodate Hallman's restrictions and his skill level.

For the reasons set forth above, the Court concludes that it was reasonable for Liberty to find that Hallman was not disabled from "any occupation." Thus, Liberty's decision to uphold the denial of Hallman's benefits was reasonable and was not arbitrary and capricious.

## III. Hallman's Claims Based on Failure to Respond to Requests

In addition to his claims based on the termination of his long term disability benefits, Hallman asserts a claim based on Defendants' alleged failure to respond to his requests for information. The Court in its discretion may hold a plan administrator personally liable to a plan participant based on the plan administrator's failure to comply with a request for

information "which [the] administrator is required by this subchapter to furnish to a participant or beneficiary." 29 U.S.C. § 1132(c)(1). The term "administrator" means either "the person specifically so designated by the terms of the instrument under which the plan is operated" or "if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A)(i)-(ii). Neither party pointed to evidence that the Policy or any other document specifically designates a plan administrator, and the Court found no such provision. Therefore, under 29 U.S.C. § 1002(16)(A)(ii), the administrator is the plan sponsor: Novelis. Hallman did not point to any evidence that Novelis failed to provide him with information it was required to furnish to him, so Novelis is entitled to summary judgment on this claim.

Hallman argues that the Court should hold Liberty liable under § 1132(c)(1) as a fiduciary of Novelis. The statute does not state that an entity other than the administrator may be held liable under § 1132(c)(1). Even if it did, § 1132(c)(1) only provides that an administrator may be liable for failing or refusing to comply with a request for information the administrator is required by statute to provide about the participant's rights. *See, e.g., Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1210 (N.D. Ga. 2005) (noting that a plan administrator must provide certain plan documents under

32

29 U.S.C. § 1024);   29   U.S.C. § 1024(b)(4)   (requiring   plan administrator to furnish, upon written request of a participant, "a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated"). Hallman does not, however, argue that Liberty failed to provide him with information that it was required *by statute* to provide. For this reason, even if Hallman could pursue a failure to respond claim against Liberty, such a claim fails.

Hallman's real argument is that Liberty did not comply with a regulation requiring "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). Hallman claims that Liberty failed to provide (1) a copy of a March 2012 surveillance video and (2) the curriculum vitae of all of the experts consulted on Hallman's file. He contends that Liberty's failure to provide these documents deprived him of an opportunity to pursue his claim adequately.

Regarding the video, Liberty pointed out that the claim file contained a link to the 2012 video. *See* Admin. R. VIII at CL 0753 (showing the link to the video). Liberty also pointed to evidence that it sent the entire claim file to Hallman's

lawyers in February 2013, November 2013, and July 2014.  Admin.
R. V at CL 0446; Admin. R. I at CL 0206, CL 0062.  And Liberty
pointed to evidence that it sent a thumb drive containing the
claim file directly to Hallman in October 2013.  Admin. R. I at
CL 0005-6, CL 0218.  Hallman did not present any evidence to
establish that the video link, which can be accessed by typing
the URL into the address bar of an internet browser, was not
included in any of the four claim file copies that Liberty sent
to Hallman or his attorney.  The Court thus cannot conclude that
Liberty failed to provide Hallman with a copy of the 2012 video.

Regarding the CVs, Hallman asserts that Liberty failed to
provide them when his counsel originally requested them in
November 2013.  It is undisputed that Liberty did not obtain the
CVs or send them to Hallman's counsel until July 2014.  *Id.* at
CL 0003, CL 0062.  But Hallman did not establish that the
documents were "relevant" within the meaning of the regulation
because he did not point to evidence that they were relied on,
submitted, considered, or generated in the course of making the
benefit determination.  *See* 29 C.F.R. § 2560.503-1(m)(8)
(defining "relevant").  Even if the CVs were relevant to his
claim, Hallman did not point to any evidence that a delay in
Liberty's sending of the CVs adversely affected his ability to
pursue his claims.  For these reasons, any claim based on
Liberty's delay in sending Hallman the CVs fails.

34

CONCLUSION

For the reasons set forth above, the Court grants Liberty's motion for judgment on the administrative record (ECF No. 22) and denies Hallman's motion for summary judgment (ECF No. 23).

IT IS SO ORDERED, this 10th day of November, 2016.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA